**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSEPH A. KENNEDY,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>BREMERTON SCHOOL DISTRICT,<br>*Defendant-Appellee.* | No. 20-35222<br><br>D.C. No.<br>3:16-cv-05694-RBL<br><br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted January 25, 2021
Pasadena, California

Filed March 18, 2021

Before: DOROTHY W. NELSON, MILAN D. SMITH,
JR., and MORGAN CHRISTEN, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Christen

## SUMMARY*

### Civil Rights

The panel affirmed the district court's summary judgment in favor of Bremerton School District in an action brought by Joseph Kennedy, the District's former high school football coach, who alleged that his rights were violated under the First Amendment and Title VII of the Civil Rights Act of 1964 when the District prohibited him from praying at the conclusion of football games, in the center of the field, potentially surrounded by Bremerton students, and members of the community.

The panel held that the record before it and binding Supreme Court precedent compelled the conclusion that the District would have violated the Establishment Clause by allowing Kennedy to engage in the religious activity he sought.  Kennedy's attempts to draw nationwide attention to his challenge to the District showed that he was not engaging in private prayer.  Instead, he was engaging in public speech of an overtly religious nature while performing his job duties.  The District tried to accommodate Kennedy, but that was spurned by Kennedy insisting that he be allowed to pray immediately after the conclusion of each game, potentially surrounded by students.  The panel held that the district court correctly granted summary judgment to the District on Kennedy's free speech and free exercise claims.

---

* This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that Kennedy's Title VII claims alleging failure to rehire, disparate treatment, failure to accommodate and retaliation also failed.  The panel held that the record reflected that Kennedy did not show that he was adequately performing his job; he could not make out a prima facie case of disparate treatment; the District could not reasonably accommodate Kennedy's practice without undue hardship; and the District had a legitimate nondiscriminatory reason for its adverse employment actions.

Concurring, Judge Christen, joined by Judge D.W. Nelson, stated that she concurred in the majority's decision affirming the district court's order granting summary judgment, and dismissing Kennedy's Free Speech and Free Exercise claims.  Judge Christen wrote separately to underscore why, in her view, the outcome of this appeal was entirely driven by the circumstances from which Kennedy's claims arose.

**COUNSEL**

Devin S. Anderson (argued), Emily Merki Long, and Elizabeth Hedges, Kirkland & Ellis LLP, Washington, D.C.; Hiram Sasser, Michael Berry and Stephanie N. Taub, First Liberty Institute, Plano, Texas; Anthony J. Ferate, Spencer Fane LLP, Oklahoma City, Oklahoma; Jeffrey Paul Helsdon, Helsdon Law Firm PLLC, Tacoma, Washington; for Plaintiff-Appellant.

Michael B. Tierney (argued) and Paul Correa, Tierney & Correa P.C., Mercer Island, Washington, for Defendant-Appellee.

Richard B. Katsee (argued) and Alexander Gouzoules, Americans United for Separation of Church and State, Washington, D.C., for Amici Curiae Religious and Civil Rights Organizations.

Francisco M. Negrón Jr., Chief Legal Officer, National School Boards Association, Alexandria, Virginia; Sloan R. Simmons and Courtney de Groof, Lozano Smith, Sacramento, California; for Amici Curiae National School Boards Association, Association of Alaska School Boards, Arizona School Boards Association, California School Arizona School Boards Association, California School Boards Association, Nevada Association of School Boards, and Washington State School Directors' Association.

Kevin G. Clarkson, Attorney General; Katherine Demarest, Senior Assistant Attorney General; Alaska Department of Law, Anchorage, Alaska; Ken Paxton, Attorney General; Jeffrey C. Mateer, First Assistant Attorney General; Ryan L. Bangert, Deputy First Assistant Attorney General; Kyle D. Hawkins, Solicitor General; Kyle D. Highful and Natalie D. Thompson, Assistant Solicitors General; Office of the Attorney General, Austin, Texas; for Amici Curiae States of Alaska, Texas, Alabama, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, and West Virginia.

**OPINION**

M. SMITH, Circuit Judge:

This case requires us to decide whether Bremerton School District (BSD) would have violated the Establishment Clause by allowing Joseph Kennedy, a high school football coach, to engage in demonstrative religious conduct immediately after football games, while kneeling on the field's fifty-yard line, surrounded by many of his players, and occasionally members of the community. To answer this question, we must examine whether a reasonable observer, aware of the history of Kennedy's religious activity, and his solicitation of community and national support for his actions, would perceive BSD's allowance of Kennedy's conduct as an endorsement of religion. Although there are numerous close cases chronicled in the Supreme Court's and our current Establishment Clause caselaw, this case is not one of them. When BSD's superintendent became aware of Kennedy's religious observances on the 50-yard line with players immediately following a game, he wrote Kennedy informing him what he must avoid doing in order to protect BSD from an Establishment Clause claim. In response, Kennedy determined he would "fight" his employer by seeking support for his position in local and national television and print media, in addition to seeking support on social media. In a letter from his counsel, he informed BSD that he would not comply with its instructions, and that he intended to continue engaging in the kind of mid-field religious exercises he had been told not to perform. Answering Kennedy's solicitation, scores of parents, a state representative, and students from both teams rushed to mid-field after a game to support Kennedy against BSD's efforts to avoid violating the Constitution. All of this

6       KENNEDY V. BREMERTON SCHOOL DISTRICT

was memorialized and broadcast by local and national TV stations and print media.

District personnel received hateful communications from some members of the public, and some BSD personnel felt physically threatened. When it evaluated BSD's actions concerning Kennedy, the district court held that seeking to avoid an Establishment Clause claim was the "sole reason" BSD limited Kennedy's public actions as it did. We hold that BSD's allowance of Kennedy's conduct would violate the Establishment Clause; consequently, BSD's efforts to prevent the conduct did not violate Kennedy's constitutional rights, nor his rights under Title VII. We affirm the district court's grant of summary judgment to BSD on all claims.

## FACTUAL AND PROCEDURAL BACKGROUND

We previously affirmed the district court's denial of Kennedy's request for a preliminary injunction. *Kennedy v. Bremerton Sch. Dist.* (*Kennedy I*), 869 F.3d 813 (9th Cir. 2017). Although our opinion in *Kennedy I* set forth the facts as they were known at the time, we nevertheless include the relevant facts here—both those in the record at the time of *Kennedy I*, and those added to the record since.

BSD employed Kennedy as a football coach at Bremerton High School (BHS) from 2008 to 2015. Kennedy was an assistant coach for the varsity football team and the head coach for the junior varsity football team. Kennedy's contract expired at the end of each football season. The contract provided that BSD "entrusted" Kennedy "to be a coach, mentor and role model for the student athletes." Kennedy further acknowledged that, as a football coach, he was "constantly being observed by others."

Kennedy is a practicing Christian.  Kennedy's religious beliefs required him to "give thanks through prayer, at the end of each game, for what the players had accomplished and for the opportunity to be a part of their lives through football."  Specifically, "[a]fter the game [was] over, and after the players and coaches from both teams [ ] met to shake hands at midfield," Kennedy felt called to kneel at the 50-yard line and offer a brief, quiet prayer of thanksgiving for player safety, sportsmanship, and spirited competition." Kennedy's prayer usually lasted about thirty seconds. Kennedy's religious beliefs required that his prayer occur on the field where the game was played, immediately after the game concluded. This necessarily meant that spectators—students, parents, and community members—would observe Kennedy's religious conduct.

Kennedy began performing these prayers when he first started working at BHS.  At the outset, he prayed alone. Several games into his first season, however, a group of BHS players asked Kennedy whether they could join him.  "This is a free country," Kennedy replied, "You can do what you want."  Hearing that response, the students joined him.  Over time, the group grew to include the majority of the team.  The BHS players sometimes invited the opposing team to join. BHS principal John Polm testified that he later became aware of a parent's complaint that his son "felt compelled to participate" in Kennedy's religious activity, even though he was an atheist, because "he felt he wouldn't get to play as much if he didn't participate."

8       KENNEDY V. BREMERTON SCHOOL DISTRICT

Eventually, Kennedy's religious practice evolved. He began giving short motivational speeches at midfield after the games. Students, coaches, and other attendees from both teams were invited to participate. During the speeches, the participants kneeled around Kennedy. He then raised a helmet from each team and delivered a message containing religious content. Kennedy subsequently acknowledged that these motivational speeches likely constituted prayers.

BSD first learned that Kennedy was praying on the field in September 2015, when the opposing team's coach told BHS principal John Polm that Kennedy had asked his team to join him in prayer on the field. He also noted that "he thought it was pretty cool how [BSD] would allow" Kennedy's religious activity. After learning of the incident, Athletic Director Barton spoke with Kennedy and expressed disapproval when Kennedy conducted a prayer on the field. In response, Kennedy posted on Facebook, "I think I just might have been fired for praying." Shortly thereafter, BSD "was flooded with thousands of emails, letters, and phone calls from around the country" regarding the conflict over Kennedy's prayer, "many of which were hateful or threatening."

BSD's discovery prompted an inquiry into whether Kennedy was complying with the school board's policy on "Religious-Related Activities and Practices." Pursuant to that policy, "[a]s a matter of individual liberty, a student may of his/her own volition engage in private, non-disruptive prayer at any time not in conflict with learning activities." In addition, "[s]chool staff shall neither encourage nor discourage a student from engaging in non-disruptive oral or silent prayer or any other form of devotional activity."

The District's investigation revealed that coaching staff had received little training regarding the District's policy. Accordingly, BSD Superintendent Aaron Leavell sent Kennedy a letter on September 17, 2015, to clarify the District's prospective expectations.

Leavell advised Kennedy that he could continue to give inspirational talks but "[t]hey must remain entirely secular in nature, so as to avoid alienation of any team member." He further advised that "[s]tudent religious activity must be entirely and genuinely student-initiated, and may not be suggested, encouraged (or discouraged), or supervised by any District staff." Leavell further counseled Kennedy that "[i]f students engage in religious activity, school staff may not take any action likely to be perceived by a reasonable observer, who is aware of the history and context of such activity at BHS, as endorsement of that activity." Lastly, Leavell stressed that Kennedy was

> free to engage in religious activity, including prayer, so long as it does not interfere with job responsibilities. Such activity must be physically separate from any student activity, and students may not be allowed to join such activity. In order to avoid the perception of endorsement discussed above, such activity should either be non-demonstrative (*i.e.*, not outwardly discernible as religious activity) if students are also engaged in religious conduct, or it should occur while students are not engaging in such conduct.

In response, Kennedy temporarily stopped praying on the field after football games. Instead, after the September 18th game, Kennedy gave a short motivational speech "that

included no mention of religion or faith." According to Kennedy, he began to drive home that night but turned around to go back to the field because he "felt dirty," knowing that, by not praying at the conclusion of the game, he had broken his commitment to God. Back at the field, Kennedy waited ten to fifteen minutes until "everyone else had left the stadium" so that he could have "a moment alone with God" to pray at the fifty-yard line.

BSD received no further reports of Kennedy praying on the field after games, and BSD officials believed that Kennedy was complying with its directive that allowed his religious activity, so long as he avoided "the perception of endorsement." According to Kennedy's averment in his deposition, however (and contrary to the allegations he raised in his EEOC complaint), he prayed directly after every game except the one on September 18.

Kennedy's increasingly direct challenge to BSD escalated when he wrote BSD through his lawyer on October 14, 2015. The letter announced that Kennedy would resume praying on the fifty-yard line immediately after the conclusion of the October 16, 2015 game. Kennedy testified in his deposition that he intended the October 14 letter to communicate to the district that he "wasn't going to stop [his] prayer because there was [sic] kids around [him]." In other words, Kennedy was planning to pray on the fifty-yard line immediately after the game, and he would allow students to join him in that religious activity if they wished to do so. The lawyer's letter also demanded that BSD rescind the directive in its September 17 letter that Kennedy cease his post-game prayers at the fifty-yard line immediately after the game.

Kennedy's intention to pray on the field following the October 16 game was widely publicized through Kennedy

and his representatives' "numerous appearances and announcements [on] various forms of media." For example, the Seattle Times published an article on October 14 (the same day as the lawyer's letter was sent to BSD), entitled "Bremerton football coach vows to pray after game despite district order. A Bremerton High School football coach said he will pray at the 50-yard line after Friday's homecoming game, disobeying the school district's orders and placing his job at risk." The Seattle Times has the twenty-third largest circulation of any newspaper in the country, with an average Sunday circulation of 364,454. *See Circulation numbers for the 25 largest newspapers*, Seattle Times (May 1, 2012), https://bit.ly/2OGgYX5.

In an attempt to secure the field from public access, BSD "made arrangements with the Bremerton Police Department for security, had signs made and posted, had 'robo calls' made to District parents, and otherwise put the word out to the public that there would be no access to the field." A Satanist religious group contacted BSD in advance of the game to notify them that "it intended to conduct ceremonies on the field after football games if others were allowed to."

On the day of the game, the District had not yet responded to Kennedy's letter. Kennedy nonetheless proceeded as he indicated he would. The Satanist group was present at the game, but "they did not enter the stands or go on to the field after learning that the field would be secured." But Kennedy had access to the field by virtue of his position as a public-school employee. Once the final whistle blew, Kennedy knelt on the fifty-yard line, bowed his head, closed his eyes, "and prayed a brief, silent prayer." According to Kennedy, while he was kneeling with his eyes closed, "coaches and players from the opposing team, as well as members of the general public and media, spontaneously

joined [him] on the field and knelt beside [him]." Kennedy's claim that the large gathering around him of coaches, players, a state elected official, and other members of the public who had been made aware of Kennedy's intentions because of the significant amount of publicity advertising what Kennedy was about to do, was "spontaneous" is self-evidently inaccurate.    Moreover, Kennedy's counsel acknowledged in his October 14, 2015 letter that Kennedy's prayers were "verbal" and "audible," flatly contradicting Kennedy's own recounting.    BSD stated that this demonstration of support for Kennedy involved "people jumping the fence" to access the field, and BSD received complaints from parents of students who had been knocked down in the stampede.  Principal John Polm said that he "saw people fall[.]"  Principal Polm testified that "when the public went out onto the field, we could not supervise effectively," resulting in "an inability to keep kids safe."  A photo of this scene is in the record, and it depicts approximately twenty players in uniform kneeling around Kennedy with their eyes closed, a large group of what appear to be adults standing outside the ring of praying players, and several television cameras photographing the scene.

In the days after the game, similar pictures were "published in various media."    Kennedy also made numerous media appearances in connection with the October 16 game, to, in his words, "spread[] the word of what was going on in Bremerton."  For example, on October 18, 2015, CNN featured an article entitled "Despite orders, Washington HS coach prays on field after game."

On October 23, 2015, BSD sent Kennedy a letter explaining that his conduct at the October 16 game violated BSD's policy.    BSD reiterated that it "can and will" accommodate "religious exercise that would not be

perceived as District endorsement, and which does not otherwise interfere with the performance of job duties." To that end, it suggested that "a private location within the school building, athletic facility or press box could be made available to [Kennedy] for brief religious exercise before and after games." Kennedy, of course, could also pray on the fifty-yard line after the stadium had emptied, as he did on September 18. Because the "[d]evelopment of accommodations is an interactive process," the District invited Kennedy to offer his own suggestions. Kennedy and his attorneys' only response in the record to BSD's invitation was informing the media that the only acceptable outcome would be for BSD to permit Kennedy to pray on the fifty-yard line immediately after games.

Kennedy engaged in the same behavior in violation of BSD's directive on October 23, 2015 and October 26, 2015. A photo taken after the October 23 game shows Kennedy kneeling alone on the field while players and other individuals mill about. A photo taken after the October 26 game shows at least six individuals, some of whom appear to be school-age children, kneeling around Kennedy.

Following the October 26 game, BSD placed Kennedy on paid administrative leave. When Kennedy was on leave, and during the time he temporarily ceased performing on-field prayers, BHS players did not initiate their own post-game prayer.

During this time, other BSD employees testified that they suffered repercussions due to the "attention given to Mr. Kennedy's issue and the way he chose to address the situation." For example, Nathan Gillam, BHS's head football coach, testified that during the controversy, "an adult who [he] had never seen before came up to [his] face and cursed [him] in a vile manner." Gillam further stated

that he was concerned for his physical safety. He testified, "One of the assistant football coaches was also a police officer and, as we headed down to the field for one game, I obliquely asked him what he thought about whether we could be shot from the crowd." As a result of these concerns, Gillam "decided that [he] would resign" from the coaching position he had held for eleven years.

After the season wound down, BSD began its annual process of providing its coaches with performance reviews. Gillam recommended that Kennedy not be rehired because Kennedy "failed to follow district policy," "his actions demonstrated a lack of cooperation with administration," he "contributed to negative relations between parents, students, community members, coaches and the school district," and he "failed to supervise student-athletes after games due to his interactions with [the] media and [the] community." Kennedy did not apply for a 2016 coaching position.

Kennedy commenced this action in the Western District of Washington on August 9, 2016. He asserted that his rights were violated under the First Amendment and Title VII of the Civil Rights Act of 1964. Kennedy moved for a preliminary injunction on August 24, 2016. The district court denied the preliminary injunction on September 19, 2016. Kennedy appealed the denial, and our panel affirmed. *Kennedy I*, 869 F.3d at 813. Kennedy petitioned for a writ of certiorari; the Supreme Court denied the petition. *Kennedy v. Bremerton Sch. Dist.* (*Kennedy II*), 139 S. Ct. 634 (2019) (mem.).

On remand, the parties cross-moved for summary judgment. The district court held that "the risk of constitutional liability associated with Kennedy's religious conduct was the 'sole reason' the District ultimately suspended him." The district court further held that BSD's

KENNEDY V. BREMERTON SCHOOL DISTRICT        15

actions were justified due to the risk of an Establishment Clause violation if BSD allowed Kennedy to continue with his religious conduct. Pursuant to this reasoning, the district court granted BSD's motion for summary judgment on all claims, and Kennedy appealed.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*. *United States v. Phattey*, 943 F.3d 1277, 1280 (9th Cir. 2019). Our task is to "view the evidence in the light most favorable" to Kennedy, "and determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (cleaned up).

## ANALYSIS

### A.

We begin with Kennedy's free speech claim brought pursuant to 42 U.S.C. § 1983. In *Pickering*, the Supreme Court held that "[t]he problem" in a public-employee free speech case, "is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). "[S]ince *Pickering*," we wrote, the law on this topic "has evolved dramatically, if sometimes inconsistently. Unraveling *Pickering*'s tangled history reveals a sequential five-step series of questions." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Those questions are:

16      KENNEDY V. BREMERTON SCHOOL DISTRICT

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.* At issue here are factors (2) and (4). If Kennedy spoke as a public employee when he engaged in demonstrative religious activity at the fifty-yard line necessarily in view of the players and fans who stayed to the conclusion of the game, his speech is unprotected. *See id.* at 1071. Kennedy carries the burden of proof on factor (2). *Id.* Similarly, if BSD had adequate justification for treating Kennedy differently from other members of the public, Kennedy's claim fails. *Id.* at 1072. BSD carries the burden of proof on factor (4). *Id.*

**1.**

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*

*v. Franks*, 573 U.S. 228, 240 (2014).   In answering that question,

> [t]he proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 547 U.S. at 424–25.

In *Kennedy I*, we held that Kennedy spoke as a public employee, and thus his free speech claim failed at factor (2). 869 F.3d at 825.  We explained that Kennedy "was one of those especially respected persons chosen to teach on the field, in the locker room, and at the stadium.  He was clothed with the mantle of one who imparts knowledge and wisdom. Like others in this position, expression was Kennedy's stock in trade." *Id.* at 826 (quoting *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 522 (9th Cir. 1994) (internal citations and quotation marks omitted)).   Thus, his expression on the field—a location that he only had access to because of his employment—during a time when he was generally tasked with communicating with students, was speech as a government employee. *Id.* at 828.  We briefly address factor (2) to discuss subsequent developments. Our holding, however, has not changed.

First, our opinion in *Kennedy I* should not be read to suggest that, for instance, a teacher bowing her head in silent prayer before a meal in the school cafeteria would constitute

18      KENNEDY V. BREMERTON SCHOOL DISTRICT

speech as a government employee.  *See Kennedy II*, 139 S. Ct. at 636 (Alito, J.).  That type of expression is of a wholly different character than Kennedy's: Kennedy insisted that his speech occur while players stood next to him, fans watched from the stands, and he stood at the center of the football field.  Moreover, Kennedy repeatedly acknowledged that—and behaved as if—he was a mentor, motivational speaker, and role model to students *specifically at the conclusion of a game*.  That distinguishes this case from the hypothetical scenario of a teacher in the cafeteria.

We acknowledge the Supreme Court's warning not to create "excessively broad job descriptions" that "convert" expressions of a private citizen into speech as a government employee.  *Id.* (quoting *Garcetti*, 547 U.S. at 424).  But on the record before us, there is simply no dispute that Kennedy's position encompassed his post-game speeches to students on the field.  Kennedy's employer specifically instructed him (1) that he should speak to players post-game and (2) what the speeches should be about: "You may continue to provide motivational, inspirational talks to students before, during and after games and other team activity, focusing on appropriate themes such as unity, teamwork, responsibility, safety, endeavor and the like that have long characterized your very positive and beneficial talks with students."  In commenting on Kennedy's secular post-game speech on September 18, Leavell wrote, "That talk was well received, and appreciated by the District and the community.  I would certainly encourage continuation of that practice."  The only conclusion based on this record is that Kennedy's post-game speech on the field was speech as a government employee.

Second, our prior opinion in this case was not meant to suggest that a teacher or coach "cannot engage in any outward manifestation of religious faith" while *off duty*. *Id.* at 637. In *Kennedy I*, we cited Kennedy's prayer in the bleachers, surrounded by news cameras, two days after BSD issued a public statement explaining Kennedy's suspension, in the context of "bolster[ing]" the already strong inference that he "inten[ded] to send a message to students and parents about appropriate behavior and what he values as a coach," in line with his job duties of demonstrative communication as a role model for players. 869 F.3d at 826. Kennedy's intent to send a message is important because this media event represented a continuation of his on-field demonstrative activities after the October 16, 23, and 26 games that were designed to attract publicity. Nevertheless, Kennedy's *pre-suspension* prescribed speaking responsibilities were the touchstone of our prior decision holding that Kennedy spoke as a government employee— and they remain so in this one.

We also note the following from the opinion of the district court: "Although Kennedy originally claimed to be off duty after games, he has now abandoned that contention . . . . All of the evidence, including Kennedy's own testimony, confirms that his job responsibilities extended at least until the players were released after going to the locker room."

We therefore remain convinced that our conclusion in *Kennedy I*, that "Kennedy spoke as a public employee when he kneeled and prayed on the fifty-yard line immediately after games while in view of students and parents" is correct. 869 F.3d at 831.

**2.**

However, even if we were to assume, *arguendo*, that Kennedy spoke as a private citizen, BSD may still prevail if it can show that it had an adequate justification for treating Kennedy differently from other members of the general public. We hold that BSD's justification was adequate.

"[A] state interest in avoiding an Establishment Clause violation may be characterized as compelling, and therefore may justify content-based discrimination." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) (internal quotation marks omitted); *see also Peloza*, 37 F.3d at 522 ("The school district's interest in avoiding an Establishment Clause violation trumps [a teacher's] right to free speech.").

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Fourteenth Amendment incorporated the Establishment Clause against the states and their public-school systems. *See Wallace v. Jaffree*, 472 U.S. 38, 49–50 (1985). The Clause "mandates government neutrality between religion and religion, and between religion and nonreligion." *McCreary Cnty., Ky. v. Am. Civil. Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). "The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987). In that setting, "[t]he State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Id.* at 584. Accordingly, the Clause "proscribes public schools from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred." *Lee*

*v. Weisman*, 505 U.S. 577, 604–05 (1992) (Blackmun, J., concurring) (internal quotation marks and emphasis omitted).

The Supreme Court has made clear that an Establishment Clause analysis "not only can, but *must*, include an examination of the circumstances surrounding" the action alleged to have violated the Clause. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000) (emphasis added). Like the Court, "[w]e refuse to turn a blind eye to the context in which" Kennedy's conduct arose. *Id.* Guided by *Santa Fe*, we ask whether an objective observer, familiar with the history of Kennedy's on-field religious activity, coupled with his pugilistic efforts to generate publicity in order to gain approval of those on-field religious activities, would view BSD's allowance of that activity as "stamped with [his or] her school's seal of approval." *Id.* at 308. Here, the answer is unquestionably yes.

At the outset, we address Kennedy's repeated contention that the practice he sought to engage in was a brief, personal, and private prayer. While his prayer may have been brief, the facts in the record utterly belie his contention that the prayer was personal and private. As noted, Kennedy engaged in a media blitz between October 14, 2015—when Kennedy's attorney informed BSD that he would be reinstituting his prior practice that included allowing

students to join his prayer[1]—and October 16, 2015.[2] Kennedy's deposition included the following exchange: "Q. So you appeared on the media because you wanted to spread the word about what you were doing?  A. I was sharing the word, yes, sir."  These media appearances took place prior to Kennedy's on-field prayer on October 16, 23,

---

[1] Kennedy confirmed in his deposition that the October 14 letter included his intention not to stop students from joining his prayer:

> Q. So where it says in the last paragraph, "Coach Kennedy will continue his practice," do you understand that is saying that you will continue your practice of praying with students if the students come around you?
>
> A. I wasn't going to stop my prayer because there was kids around me.
>
> Q. So is that a yes, sir?
>
> . . . .
>
> A. Yes.

[2] We note that Kennedy's media appearances continue to the present day. *See, e.g.*, Joe Kennedy, "Football Coach Joe Kennedy: A prayer sidelined me – here's why I'm still fighting to get back in the game," Fox News (January 26, 2021), https://fxn.ws/3cmoWyq; Fox & Friends, "Ex-high school football coach still fighting five years after he was fired by school for praying on field," Fox News (January 26, 2021), https://fxn.ws/3la91pv; First Liberty, "Coach Joe Kennedy: How 20 Years in the Marine Corps Gave Him the Courage to Kneel," (May 3, 2019), https://bit.ly/3ak1e38 (interview with Kennedy in which Kennedy stated, "I couldn't believe that after 20 years of serving and protecting the Constitution they would tell me that my rights didn't matter because I was a public employee.  And as a Marine, I knew I had to fight.  I always told the young men whom I coached to stand up when adversity came their way.  I had to be a leader to them and live up to what I said.  So I wasn't going to back down[.]").

and 26. That on-field prayer cannot be construed as personal and private in the context of Kennedy's publicity leading up to it.

Context matters. As we know from *Santa Fe*, we must examine the surrounding circumstances to determine whether BSD rescinding the September 17 directive and allowing Kennedy free rein over his public demonstrations of religious exercise would have been perceived as a stamp of approval upon that exercise. Thus, at issue in this case is *not*, as Kennedy attempts to gloss it, a personal and private exercise of faith. At issue was—in every sense of the word—a demonstration, and, because Kennedy demanded that it take place immediately after the final whistle, it was a demonstration necessarily directed at students and the attending public.

The evolution of Kennedy's prayer practices with students is also essential to understanding how an objective observer would view BSD continuing to allow Kennedy to pray on-field. An objective observer would know that, eight years earlier, Kennedy began praying alone on the fifty-yard line at the conclusion of each game. Over time, little by little, his players began to join him in this activity—at least one out of a fear that declining to do so would negatively impact his playing time. Kennedy did not stop players from joining him then, just as he made clear to BSD on October 14, 2015 that he would not stop them from joining him when he resumed his practice after the October 16 game. Indeed, as noted, the record unquestionably reflects that after October 14, 2015, Kennedy actively sought support from the community in a manner that encouraged individuals to rush the field to join him and resulted in a conspicuous prayer circle that included students. An objective observer would know, in advance of the October 16 game, BSD made clear

24    KENNEDY V. BREMERTON SCHOOL DISTRICT

that the field was not open to the public, specifically denying access to other religious groups. Yet, Kennedy used his access as a school employee to conduct his religious activity. Viewing this scene, an objective observer could reach *no other conclusion* than that BSD endorsed Kennedy's religious activity by not stopping the practice:



Post-game ritual on the field, October 16, 2015.

Kennedy points to his post-game prayer on October 23, 2015—when no one joined him—in an attempt to establish that all he wants is to pray alone. But this mischaracterizes the record. Instead, the record reflects that if BSD permitted Kennedy to resume his prior practice, students would join him. One instance, out of many, in which students did not join Kennedy's prayer cannot require us to pretend they never did and never will.[3] In sum, there is no doubt that an

---

[3] Throughout this litigation, Kennedy has urged us to turn a blind eye to the trajectory of his practice in favor of a segmented view of the

objective observer, familiar with the history of Kennedy's practice, would view his demonstrations as BSD's endorsement of a particular faith. For that reason, BSD had adequate justification for its treatment of Kennedy, and the district court correctly granted summary judgment to BSD on Kennedy's free speech claim.

**B.**

We next address Kennedy's free exercise claim. In *Church of Lukumi*, the Court wrote that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993). Pursuant to that analysis, a law that is *not* neutral and generally applicable "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531–32.

The District concedes that its September 17 directive is not neutral and generally applicable. It purports to restrict

---

evidence, picking parts that help his case and discarding those that do not. For example, during oral argument, Kennedy's counsel urged us to focus primarily on BSD's October 23 letter. This letter—when read in isolation—appears to assert that any demonstration of faith by any teacher in any context would be impermissible. But acceding to Kennedy's framing of the record would be rejecting the very inquiry that *Santa Fe* mandates. The October 23 letter was written after Kennedy rejected the restrictions announced in the September 17 letter and announced his intention to resume his unconstitutional behavior over his employer's clear prohibition. Such a myopic view of the events leading to litigation simply does not tell the whole story—like attempting to decipher the plot of "The Wizard of Oz" by viewing a still photograph of Dorothy waking in her bed at the end of the film.

Kennedy's religious conduct *because* the conduct is religious. *See id.* at 532 ("[T]he protections of the Free Exercise Clause pertain if the law at issue . . . regulates . . . conduct *because it is undertaken for religious reasons.*" (emphasis added)).   But the District contends that its directive satisfies strict scrutiny.  We agree.

**1.**

"[A] state interest in avoiding an Establishment Clause violation 'may be characterized as compelling,' and therefore may justify content-based discrimination," *Good News Club*, 533 U.S. at 113–14 (quoting *Widmar v. Vincent*, 454 U.S. 263, 271 (1981)), such as prohibiting religious conduct that could be imputed to the District.  Based on the Establishment Clause analysis in the fourth *Eng* factor above, the District's September 17 directive was thus motivated by a compelling state interest.[4]

---

[4] We determined above that BSD's concern that it would violate the Establishment Clause by allowing Kennedy's conduct was well-founded—this activity indeed constituted a violation.  But even without our holding as to the Establishment Clause, BSD had reason for concern. Public school districts were repeatedly sued in federal district courts across the country for alleged Establishment Clause violations in the ten years preceding BSD's September 17 letter to Kennedy.  *See, e.g.*, *Sherman v. Twp. High School Dist. 214*, 624 F. Supp. 907 (N.D. Ill. 2007); *Doe v. Wilson Cnty. Sch. Sys.*, 524 F. Supp. 2d 964 (M.D. Tenn. 2007); *Am. Humanist Ass'n v. S.C. Dep't of Educ.*, 108 F. Supp. 3d 355 (D.S.C. 2015); *Ryan v. Mesa Unified Sch. Dist.*, 64 F. Supp. 3d 1356 (D. Ariz. 2014); *see also Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 178–79 (3d Cir. 2008) (holding that the Establishment Clause prohibited a football coach from bowing his head while players prayed because of his history of leading the team in prayer).

KENNEDY V. BREMERTON SCHOOL DISTRICT       27

**2.**

In this context, a regulation fails the narrow tailoring prong of strict scrutiny if it is either overbroad or underinclusive given the government's compelling interest. *Church of Lukumi*, 508 U.S. at 546. For example, in *Church of Lukumi*, ordinances prohibiting animal slaughter were underinclusive for the stated interests of "protecting the public health and preventing cruelty to animals" because they failed "to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than [Plaintiff's religious] sacrifice does." *Id.* at 543.

Here, the September 17 directive and accompanying BSD policy prohibiting Kennedy's conduct were narrowly tailored to the compelling state interest of avoiding a violation of the Establishment Clause. Indeed, there was no other way to accomplish the state's compelling interest. The District tried repeatedly to work with Kennedy to develop an accommodation for him that would avoid violating the Establishment Clause; Kennedy declined to cooperate in that process and insisted that the only acceptable outcome would be praying immediately after the game on the fifty-yard line in view of students and spectators.

Because BSD had a compelling state interest to avoid violating the Establishment Clause, and it tried repeatedly to work with Kennedy to develop an accommodation for him that would avoid violating the Establishment Clause while nevertheless offering him options that were narrowly tailored to protect his rights, we affirm the decision of the district court to deny Kennedy's Free Exercise claim.

**C.**

In addition to his constitutional claims, Kennedy brought four claims pursuant to Title VII: failure to rehire, disparate treatment, failure to accommodate, and retaliation.

**1.**

Pursuant to Title VII, "an unlawful employment practice is established when the complaining party demonstrates that . . . religion . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). "In order to establish a prima facie case" in Kennedy's circumstances, he must "show that [he] was a member of a protected group [ ], that [he] was adequately performing [his] job; and that [he] suffered an adverse employment action[.]" *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000).

Kennedy established that he was a member of a protected group and that he suffered an adverse employment action. However, he did not show that he was adequately performing his job. Instead, the record reflects that Kennedy refused to follow BSD policy and conducted numerous media appearances that led to spectators rushing the field after the October 16 game, disregarding his and BSD's responsibilities to ensure students' safety. We affirm the district court's grant of summary judgment to BSD on Kennedy's failure to rehire claim.

**2.**

To establish a prima facie case of disparate treatment under Title VII, a plaintiff must show "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and

(4) similarly situated individuals outside his protected class were treated more favorably." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 656 (9th Cir. 2006). Kennedy satisfies the first three prongs but stumbles on the fourth. "Other employees are similarly situated to the plaintiff when they have similar jobs and display similar conduct." *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011) (internal quotation marks omitted).

Kennedy's conduct is clearly dissimilar to the other personal activities of assistant coaches he cites, such as checking a cell phone or greeting a spouse, because Kennedy's conduct violated the Establishment Clause, and obviously, checking a cell phone does not. Kennedy asserted that another assistant coach, David Boynton, could serve as a similarly-situated employee because Boynton once went on to the field following a game, took a picture of the scoreboard, and said a silent Buddhist chant to himself while standing. But Boynton's alleged practice of reciting silent Buddhist chants in his head while standing on the field does not make Boynton similarly situated to Kennedy, either—Leavell's declaration stated that he first "heard of an alleged Buddhist chant by Mr. Boynton [] in news reports of Mr. Kennedy's EEOC complaint in January 2016 . . . . Other than Mr. Kennedy, [Leavell had] not received any reports of any other BSD employee who has allegedly engaged in readily observable demonstrative religious activity, while on-duty in the performance of his or her job, and in the presence of students." The fact that BSD was unaware of Boynton's alleged practice shows that Boynton and Kennedy were not similarly situated; BSD had no opportunity to impose differential treatment for conduct that was unobservable.

Because Kennedy cannot make out a prima facie case of disparate treatment, we affirm the district court's grant of summary judgment to BSD on this claim.

**3.**

"To establish religious discrimination on the basis of a failure-to-accommodate theory," a plaintiff "must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). It is undisputed that Kennedy presented a prima facie case of failure-to-accommodate.

Once a plaintiff makes out a prima facie case, "the burden then shifts" to the employer "to show that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* For the reasons already discussed, BSD did both. BSD officials repeatedly offered to work with Kennedy to find an accommodation that would insulate the District from an Establishment Clause violation; Kennedy did not respond or indicated that the only acceptable outcome in his view would be resuming his prior practice of praying on the fifty-yard line immediately following the game, in full view of students and spectators. Because allowing Kennedy to do so would constitute an Establishment Clause violation, the District could not reasonably accommodate Kennedy's practice without undue hardship. Accordingly, we affirm the district court's grant of summary judgment to BSD on Kennedy's failure-to-accommodate claim.

**4.**

In a retaliation claim under Title VII, a "plaintiff has the burden of proving a prima facie case of discrimination based on opposition to an unlawful employment practice." *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir. 1983). To prove a prima facie case of retaliation based on opposition, the plaintiff must show that "(1) he has engaged in statutorily protected expression; (2) he has suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action." *Id.* If he does so, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Id.* (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Kennedy presented a prima facie case of retaliation. But Kennedy also refused to collaborate with BSD in designing a reasonable accommodation for his religious practice. Furthermore, as explained above, Kennedy made it clear that he would continue to pray on the fifty-yard line immediately following the game as long as BSD employed him—a practice that violated the Establishment Clause. This conduct is a legitimate nondiscriminatory reason for the adverse employment actions BSD took. We affirm the district court's grant of summary judgment to BSD on Kennedy's retaliation claim.

**CONCLUSION**

The record before us and binding Supreme Court precedent compel the conclusion that BSD would have violated the Establishment Clause by allowing Kennedy to pray at the conclusion of football games, in the center of the field, with students who felt pressured to join him. Kennedy's attempts to draw nationwide attention to his

32      KENNEDY V. BREMERTON SCHOOL DISTRICT

challenge to BSD compels the conclusion that he was not engaging in private prayer, but was instead engaging in public speech of an overtly religious nature while performing his job duties.  BSD tried to reach an accommodation for Kennedy, but that was spurned by his insisting that he be allowed to pray immediately after the conclusion of each game, likely surrounded by students who felt pressured to join him.

Kennedy's Title VII claims also fail.

The judgment of the district court is **AFFIRMED.**

CHRISTEN, Circuit Judge, joined by D.W. NELSON, Circuit Judge, concurring:

I concur in the majority's decision affirming the district court's order granting summary judgment, and dismissing Coach Kennedy's Free Speech and Free Exercise claims.  I write separately to underscore why, in my view, the outcome of this appeal is entirely driven by the circumstances from which Coach Kennedy's claims arose.

**I**

We consider "a sequential five-step series of questions" when evaluating Free Speech claims brought by public employees. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  The second and fourth questions are at issue in this case: whether Kennedy spoke as a private citizen or as a public employee, and whether the Bremerton School District (BSD) had adequate justification for treating Kennedy differently from other members of the public.  *Id.*

*Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), explains that a person speaks as a public employee when he makes statements pursuant to his official duties. *See Lane v. Franks*, 573 U.S. 228, 240 (2014) ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties."). *Garcetti* also cautioned that courts must not allow employers to describe job duties in infinitely elastic terms. 547 U.S at 424. *Garcetti*'s cautionary note is critically important: if employers were allowed to decide that any unpopular or unwelcome speech fell within their employees' job duties, they would be free to extinguish First Amendment rights—or at least free to require that employees choose between keeping their jobs and exercising their First Amendment right to speak. We conduct a practical inquiry to decide whether a task is within the scope of an employee's professional duties, *id.* at 424–25, so we begin from the premise that a coach's duties include teaching non-academic skills such as teamwork, sportsmanship, dedication, and personal discipline.

Here, the district court found Kennedy's job duties included mentoring students, setting a good example, and striving to "create good athletes and good human beings." BSD sent two letters to Kennedy after it learned he was engaged in religious speech with the team. The first encouraged him to "continue to provide motivational, inspirational talks to students before, during and after games and other team activity," but cautioned that his talks "may not include religious expression, including prayer." Hopefully, all instructors at Bremerton High encourage their students' efforts, but it cannot be denied that the nature of motivational talks coaches deliver to their teams differs substantially from the words of encouragement one might expect from geometry or history teachers. Kennedy

34      KENNEDY V. BREMERTON SCHOOL DISTRICT

acknowledged that the inspirational speeches he gave to players at the conclusion of games likely constituted prayer, and his speeches to the team were unmistakably the kind of motivational communication that fell squarely within his job duties. Kennedy's demonstrative on-field prayers of thanks immediately following games must be viewed in the context of the motivational talks he routinely gave to the team. On the record presented, the district court correctly concluded there was no genuine dispute that Kennedy spoke as a public employee when he engaged in religious expression during the talks he gave to the team, and when he prayed at the fifty-yard line after the team's games.

*Eng*'s fourth factor requires that we consider whether BSD had adequate justification for treating Kennedy differently from other members of the general public. 552 F.3d at 1070. The district court found the "sole reason" BSD suspended Kennedy was its desire to avoid violating the Establishment Clause. BSD's Establishment Clause defense requires that we ask whether an objective observer, familiar with the history and circumstances surrounding Kennedy's prayers, would perceive them as "state endorsement of prayer in public schools," *i.e.*, whether an objective observer would view the prayers as "stamped with [the] school's seal of approval." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (citation and internal quotation marks omitted).

Kennedy's post-game prayers took place at midfield while spectators were still in the stands, but he insisted that he only intended to engage in "brief, quiet prayer of thanksgiving for player safety, sportsmanship, and spirited competition." The district court did not question Kennedy's intentions, but it recognized that if he had been allowed to continue praying at the fifty-yard line, any objective

observer would have perceived that BSD endorsed Kennedy's speech. *Santa Fe*, 530 U.S. at 308. No other conclusion could have been drawn after Kennedy publicly announced he would defy BSD's directive that he stop praying at midfield, because spectators rushed to join him at a subsequent game and BSD was forced to engage security and close the field to the public. After the public was barred from the field, the perception that BSD endorsed Kennedy's speech was unavoidable because only his job as assistant coach allowed Kennedy access. As the district court explained, if "a director takes center stage after a performance, a reasonable onlooker would interpret their speech from that location as an extension of the school-sanctioned speech just before it." Kennedy's subjective intent to pray privately and personally did not guide BSD's response to Kennedy's actions; the question was how an objective observer would perceive Kennedy's speech.

Kennedy's talks evolved over time and the practice he eventually adopted, taking a knee at midfield and delivering what he referred to as private personal prayers alongside team members, was a thematic extension of the motivational speeches he delivered to Bremerton High's assembled football team. The majority does not imply that coaches cannot lead by example or serve as excellent role models if players see them engage in personal prayer. And it must be acknowledged that Kennedy coached high school players, who were surely less impressionable than elementary-aged students. Still, even high-schoolers are not immune from perceiving—or misperceiving—pressure to "go along," and the record shows that at least one parent confirmed a player felt "compelled to participate" in Kennedy's post-game prayers because "he felt he wouldn't get to play as much if he didn't." Kennedy agreed that coaches can have an outsized influence and "for some kids, the coach might even

be the most important person they encounter in their overall life."

No case law requires that a high school teacher must be out of sight of students or jump into the nearest broom closet in order to engage in private prayer, but it cannot be denied that this football coach's prayer at the fifty-yard line, immediately after a game, under stadium lights and in front of players and spectators, objectively sent a public message. In contrast, even an on-duty teacher tasked with supervising students in a high school cafeteria would not risk sending a message that BSD endorses her faith, nor risk inadvertently coercing students to join her, if she took a moment to give thanks before eating her meal. And the Establishment Clause can surely accommodate high school students observing a teacher giving thanks for an "all clear" announcement made in the wake of a safety scare like an earthquake tremor, or a "false alarm" announcement after a fire bell.

The opinion we entered affirming the district court's order denying Coach Kennedy's motion for a preliminary injunction made reference to prayer Kennedy engaged in while attending a game after he had been suspended. *Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813, 820, 826 (9th Cir. 2017). That off-duty speech played no role in BSD's decision to suspend Kennedy, nor did our prior opinion signal that BSD would be free to restrict Kennedy's off-duty speech. *See id.* Rather, the prayer Kennedy engaged in as a spectator after he was suspended was relevant because he was surrounded by members of the media he had courted. Although Kennedy argues he intended to engage in private prayer, his prayers were anything but private. Indeed, an objective observer would be aware that fans rushed to join Kennedy on the field and

knocked over band members at the conclusion of the October 16 game.

Kennedy candidly testified that he gave numerous media interviews before he was suspended, and that he did so in an effort to "spread the word." In those interviews, Kennedy announced a firm stance that he would continue to pray and allow the team to join him, despite BSD's directives. In response, BSD was "flooded with thousands of emails, letters, and phone calls from around the country, many of which were hateful or threatening." Given the community's response to Kennedy's public statements, BSD would have unquestionably sent a message of endorsement if it had allowed him to continue to pray at midfield. BSD's need to avoid an Establishment Clause violation provided adequate justification for prohibiting Kennedy's post-game prayers. Kennedy's Free Speech claim fails to satisfy *Eng*'s second and fourth factors. 552 F.3d at 1070.

## II

The sequence of events leading up to BSD's decision to place Kennedy on paid administrative leave painted BSD into a corner because an objective observer would have perceived the school's endorsement if Kennedy had been allowed to continue praying at midfield. BSD had a compelling interest in avoiding an Establishment Clause violation, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001), and the district court correctly ruled BSD's adverse employment action was narrowly tailored to advance that interest, *see Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 531–32 (1993).

BSD first learned of Kennedy's post-game prayers in September 2015, when an opposing team's coach told Bremerton High's principal that Kennedy had asked the

visiting team to join in a post-game prayer on the field. BSD's first letter to Kennedy explained that his post-game prayers "would very likely be found to violate the First Amendment's Establishment Clause," and provided a number of "clear standards" to which Kennedy was required to adhere. Kennedy did not publicly pray at the following game, but on October 14 he informed BSD that he would resume his practice of praying on the fifty-yard line immediately following the next game.

As explained, Kennedy's widely publicized intention to resume his post-game prayers resulted in an overwhelming response from the public, and BSD was reasonably concerned that it would be unable to "keep kids safe." BSD's concerns were realized when Kennedy resumed praying at the October 16 game and members of the public rushed the field. After that game, BSD enlisted help from the police department to provide security and also made public announcements and posted signs directing that public access to the field would no longer be allowed.

BSD's second letter reiterated that school staff may not "engage in action that is likely to be perceived as endorsing (or opposing) religion or religious activities." Nevertheless, Kennedy again prayed at the fifty-yard line following the next two games. Faced with mounting publicity and corresponding concern for student and public safety, BSD placed Kennedy on paid administrative leave.

At oral argument before our court, Kennedy's counsel repeatedly referred to a single sentence from BSD's second letter directing that "[w]hile on duty," Kennedy must refrain from engaging in "demonstrative religious activity, readily observable to (if not intended to be observed by) students and the attending public." Kennedy plucks this single sentence, and argues that it would prohibit a teacher from

giving thanks at lunchtime or engaging in any other personal prayer while on duty.  But this sentence cannot be read in isolation.  BSD consistently sought to accommodate Kennedy's religious exercise without running afoul of the Establishment Clause.  BSD's correspondence to Kennedy "ma[d]e it clear that religious exercise that would not be perceived as District endorsement, and which does not otherwise interfere with the performance of job duties, can and will be accommodated."  BSD offered Kennedy the use of a private location within the school building, athletic facility, or press box, and invited Kennedy to propose alternative accommodations.

By the time BSD's second letter directed Kennedy to refrain from engaging in religious activity observable to students and the attending public, Kennedy had announced his intention to resume praying midfield, BSD had received thousands of letters, many of which were hostile and threatening, and members of the public had knocked over some students while rushing to join him on the field after the October 16 game.  Kennedy's public statements that he would continue to pray despite BSD's direction, and the public's response to his statements, provide important context for the single sentence he isolates from BSD's second letter.

BSD's attempts to accommodate Kennedy's prayer were efforts to more narrowly tailor its response, but Kennedy did not accept any of BSD's proposed accommodations, or even acknowledge them.  Instead, he gave media interviews publicizing his intent to continue his post-game prayers and followed through by praying on the fifty-yard line at the two games that followed.  Given Kennedy's announced plans to defy BSD's reasonable directives, BSD met its burden to show its response was the least-restrictive means consistent

40      KENNEDY V. BREMERTON SCHOOL DISTRICT

with avoiding an Establishment Clause violation.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).